# JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

CLARISSA LEIGE,

                   Plaintiff,

     -against-

TINO HERNANDEZ, as Chairman of the
New York City Housing Authority,
and the NEW YORK CITY HOUSING
AUTHORITY.

                Defendants.

-----------------------------------------------------x

**08 Civ.**

**COMPLAINT**



RECEIVED
APR 28 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1.         This is an action seeking declaratory, injunctive and monetary relief brought on behalf of plaintiff Clarissa Leige ("Ms. Leige"), who for nearly ten years, with her two minor children – one of whom, Emily, is severely disabled – has resided in a building managed by defendant New York City Housing Authority ("NYCHA"). Although aware of the severity of the disabilities of Ms. Leige and of her daughter, Emily, NYCHA has improperly brought an administrative proceeding seeking to terminate Ms. Leige's tenancy – even though each of the four charges brought against Ms. Leige directly result from her and her daughter's disabilities. Defendants, in bringing these charges and seeking the eviction of the Leige family, thus violated their duty to make reasonable accommodations in their policies and procedures for disabled persons as mandated by the Americans with Disabilities, Rehabilitation, Fair Housing

1

Amendment Acts and NYCHA's own policy, and denied plaintiff due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

## JURISDICTION AND VENUE

2.        This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States; 28 U.S.C. § 1343 for actions arising under laws providing for the protection of civil rights; 28 U.S.C. § 1367 for non-federal claims so related to the action brought herein that they form part of the same case or controversy under Article III of the United States Constitution; 9 U.S.C. § 794a as an action pursuant to § 504 of the Rehabilitation Act of 1973; 29 U.S.C. § 794a and 42 U.S.C. § 12133 as an action pursuant to the Americans with Disabilities Act of 1990; NYCHA Policy and the Fourteenth Amendment of the United States Constitution.

3.        Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

4.        Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because that is the district of the Defendants' principal place of business.

## PARTIES

5.        Plaintiff CLARISSA LEIGE is a disabled tenant whose mobility is substantially impaired and who, among other things, suffers from debilitating bone cancer and severe lymphedema of the legs. Although frequently hospitalized as an inpatient, she has resided with

2

her two minor children at 2007 Surf Avenue, Apartment 6L, Brooklyn, New York since in or about April 1999. 2007 Surf Avenue is a NYCHA public housing project also known as Carey Gardens.

6.        Defendant NEW YORK CITY HOUSING AUTHORITY is a public housing agency in the City of New York, with a principal place of business of 250 Broadway, New York, New York 10007. NYCHA is Ms. Leige's landlord.

7.        Defendant TINO HERNANDEZ is the Chairman of NYCHA. Defendant Hernandez is being sued in his official capacity.

## STATUTORY AND REGULATORY SCHEME

### The Americans with Disabilities Act

8.        Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, et seq., states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

9.        Under the ADA, an individual with a disability is a person who has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or [is] regarded as having such an impairment." 28 C.F.R. § 35.104. See 42 U.S.C. 12102.

10.       The phrase "physical or mental impairment" means:

        (A)       Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech

organs), cardiovascular, reproductive, digestive, genitourinary, hemic and
lymphatic, skin, and endocrine;
    (B)    Any mental or psychological disorder such as mental retardation,
organic brain syndrome, emotional or mental illness, and specific learning
disabilities.

28 C.F.R. § 35.104.

11.    A "public entity" is defined as "any department, agency ... or other instrumentality

of a State or States or local government . . . . " 42 U.S.C. § 12131(1).

12.    A "qualified individual with a disability" is defined as "an individual with a

disability who, with or without reasonable modifications to rules, policies, or practices, the

removal of architectural, communication, or transportation barriers, or the provision of auxiliary

aids and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." 42 U.S.C. 12131(2)].

13.    U.S. Department of Justice regulations provide that

    A public entity shall make reasonable modifications
    in policies, practices, or procedures when the modifications
    are necessary to avoid discrimination on the basis of
    disability, unless the public entity can demonstrate that
    making the modifications would fundamentally alter the
    nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

14.    Federal regulations further provide that:

    (a)    No qualified individual with a disability shall, on the basis of disability, be
    excluded from participation in or be denied benefits of the services, programs, or
    other activities of a public entity, or be subjected to discrimination by any public
    entity.

    (b)(1) A public entity, in providing any aid, benefit, or
    service, may not, directly or through contractual,

4

licensing, or other arrangements, on the basis of
disability --

(i)     Deny a qualified individual with a disability the opportunity to participate in or
benefit from the aid, benefit, or service;

(ii)    Afford a qualified individual with a disability an opportunity to participate in or
benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii)   Provide a qualified individual with a disability with
an aid, benefit, or service that is not as effective in
affording equal opportunity to obtain the same result,
to gain the same benefit, or to reach the same level of
achievement as that provided to others;

* * * *

(vii)   Otherwise limit a qualified individual with a
disability in the enjoyment of any right, privilege,
advantage, or opportunity enjoyed by others receiving
the aid, benefit, or service.

* * * *

(b)(3) A public entity may not, directly or through
contractual or other arrangements, utilize criteria or
methods of administration:

(i)     That have the effect of subjecting qualified individuals with disabilities to
discrimination on the basis of disability;

28 C.F.R. § 35.130.

15.       In setting forth rules to be followed by public entities in providing services, ADA

regulations require that "[a] public entity shall take appropriate steps to ensure that

communications with applicants, participants, and members of the public with disabilities are as

effective as communications with others." 28 C.F.R. § 35.160.

16.        The Department of Justice has advised public agencies such as defendant

NYCHA that they must make reasonable modifications in their policies, practices, or procedures

to avoid discrimination that violates the ADA.

ADA Title II Technical Assistance Manual, United States Department of Justice.

## Section 504 of the Rehabilitation Act of 1973

17.        Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794,

("Section 504") provides that:

> No otherwise qualified individual with a disability in the United States, as defined
> in [29 U.S.C. § 705], shall, solely by reason of her or his disability, be excluded
> from the participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial
> assistance. . ..

29 U.S.C. § 794(a).  Section 504's definition of an "individual with a disability" is the same as

the definition under the ADA.

29 U.S.C. § 705(20)(A).

18.        Federal regulations implementing Section 504 mandate that no recipient of

Federal funds shall:

> utilize criteria or methods of administration the purpose or effect of which would:

> > (ii) Defeat or substantially impair the accomplishment of the
> > objectives of the recipient's federally assisted program or activity
> > for qualified individuals with a particular handicap ...

24 C.F.R. § 8.4(b)(4).

19.        Federally assisted programs "must afford individuals with handicaps equal

opportunity to obtain the same result, to gain the same benefit, or to reach the same level of

achievement" as "non-handicapped persons."  24 C.F.R. § 8.4(b)(2).

20.        The remedies, procedures, and rights provided by the Rehabilitation Act,

described supra, are incorporated into the ADA.  42 U.S.C. § 12133.  Furthermore, Federal

regulations implementing Title II of the ADA provide that standards under the ADA and its

implementing regulations shall not be construed as imposing lesser standards than those applied

under the Rehabilitation Act and its implementing regulations.  28 C.F.R. § 35.103(a).


**The Fair Housing Act**

21.        The Fair Housing Act prohibits discrimination in the sale or rental of housing,

exempting only single family dwellings and owner-occupied buildings containing less than five

units.  42 U.S.C. §§ 3603, 3604.

22.        In 1988, Congress amended the Fair Housing Act to bar discrimination against

people with disabilities.  The amendment provides that it shall be unlawful:

> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or
> deny, a dwelling to any buyer or renter because of a handicap of --
>
>> (A) that buyer or renter;
>>     . . . .
>
> (f)(2) To discriminate against any person in the terms,
> conditions, or privileges of sale or rental of a dwelling,
> or in the provision of services or facilities in connection
> with such dwelling, because of a handicap of --
>
>> (A) that person;
>>    . . . .

7

(f)(3) For purposes of this subsection, discrimination includes--

. . . .

(B) <u>a refusal to make reasonable accommodations</u> in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling ...

42 U.S.C. § 3604 (emphasis added).

The Fair Housing Act's definition of "handicap" mirrors the definition of an "individual with a disability" as set forth in Section 504 of the Rehabilitation Act of 1973. <u>Compare</u> 42 U.S.C. § 3602(h) <u>with</u> 29 U.S.C. § 705(20)(A).


## **NYCHA Policy**

23.         NYCHA's own policy expressly recognizes its obligations under federal law and "has designated a Coordinator to ensure its compliance with the ADA and Section 504." <u>NYCHA 070/225 (7/02) (ADA/Section 504 Grievance Procedure)</u>. In addition NYCHA has adopted its own "internal grievance procedure for prompt and equitable resolution of complaints alleging housing or employment discrimination against the disabled." <u>Id.</u> By its own terms, the "grievance procedure is not a prerequisite to the pursuit of other remedies available under the ADA or Section 504." <u>Id.</u>

24.         In addition, NYCHA's Termination of Tenancy Procedures ("Procedures") adopted pursuant to the consent decree in <u>Escalera v. New York City Housing Authority</u>, 67 Civ. 4307 (S.D.N.Y. 1971), state, in Paragraph 2 thereof, that prior to commencing proceedings to terminate a tenancy, the tenant's project manager will interview the tenant in order to discuss the problem which may lead to termination of tenancy, seek to ascertain the facts involved, and, when appropriate, seek to assist the tenant by securing outside help.

8

25.        Paragraph 3 of the Procedures states that "[i]f remedial action by the Manager

fails, or if the Manager believes that termination of tenancy is the appropriate course of action,

he shall submit [his recommendations] to the Tenancy Administrator for review . . . .

26.        Paragraph 2 of the termination procedures incorporated in the consent decree in

Escalera, states that the Manager will not forward the tenant's file to the Tenancy Administrator

unless "all efforts to resolve the problems have failed, and the Manager feels that termination of

tenancy should be pursued."

27.        Chapter VII(II)(A) of the NYCHA's Management Manual ("Manual") states that

among the Housing Manager's over-all responsibilities . . . is the prevention of the
development of conditions which might lead to termination of tenancy.  Where it
appears that a tenant is not fully aware of his/her responsibilities and is thus
jeopardizing his/her tenancy, the Housing Manager should acquaint the tenant
with these responsibilities . . . the Housing Manager should attempt, through
discussions and referrals to social agencies, to correct the conditions before they
reach a stage where there is no alternative but termination proceedings.

28.        Chapter VII(IV)(C)(3)(c) of the Manual states that

Before considering [termination proceedings] in a chronic rent delinquency case,
the Project Manager must be sure that all possible action to improve the tenant's
rent paying record has been taken.  For example, has a two party or vendor check
been requested in the case of a chronic welfare delinquent?  If all efforts have
failed, chronic rent delinquency action may be commenced ...

29.        Respondent's Management Manual states that "at the first sign of rent

delinquency, the tenants should be called to the office or interviewed at their apartments ... in

order to ascertain the reason for delinquency.  At the interview the importance of prompt rent

payments as well as the consequences of rent delinquency must be stressed."  Manual, Chapter

V(VI)(D)(3).

## STATEMENT OF FACTS

30.        Upon information and belief, defendant NYCHA is a public entity as defined by the Americans with Disabilities Act; NYCHA is a recipient of federal funds; and defendants are subject to all of the above laws.

31.        Upon information and belief, plaintiff Clarissa Leige has limited mobility and suffers from, among other things, debilitating bone cancer, incontinence and severe lymphedema of the legs and has been hospitalized for a portion of approximately each of the last 12 months.

32.        Plaintiff's daughter, Emily Leige, is 11 years old and resides with her mother.

33.        Upon information and belief, Emily Leige is severely disabled; the New York State Department of Health has found that Emily has cerebral palsy, a seizure disorder, hydrocephalus, bronchopulmonary dysphasia and sleep apnea and is non-mobile, non-verbal, legally blind, hearing impaired and developmentally delayed.

34.        Upon information and belief, Emily Leige Emily is incontinent, has not attended school since June of 2006, and functions within the profound range of mental retardation.

35.        According to the New York City Department of Education, her most recent examinations "yielded functioning to be within the profound range of mental retardation." "respiratory difficulties due to her collapsed lung," and asserts that because Emily will not open her mouth for food, "she is fed through a G-Tube."  As to her incontinence, the update notes:

        a.    "If she is wet or soiled, she has been known to take off her clothes and 'paint' her bed area with feces."
        b.    "They have tried putting her on a toilet, but she was afraid of the experience and is not being toilet trained at this time."
        c.    "Emily does not make her toileting needs known in any way."

    d.  "Since Emily is getting bigger in size, she requires two people to change her diaper."

36.        In addition, in connection with Emily's need for auditory stimulation, the update notes how "her family and support workers try hard to present her with additional stimulation in the form of various tactile and auditory toys."

37.        Ms. Leige and her daughter, Emily, are each "individuals with disabilities" within the meaning of both the ADA and Section 504 and are each "qualified individuals with disabilities" within the meaning of the ADA.

38.        Ms. Leige and her daughter, Emily, are each "handicapped" within the meaning of the Fair Housing Act.

39.        Upon information and belief, NYCHA had actual notice of Emily Leige's severe disabilities in 1999 -- at the time the Leige family initially leased its apartment in Carey Gardens.

40.        Upon information and belief, NYCHA notified plaintiff of a current administrative action brought against her by NYCHA in or about September, 2007 and at such time, NYCHA had actual notice of plaintiff's disabilities.

41.        Plaintiff's counsel received a list of amended charges (the "Charges") against her on or about March 18, 2008.  The Charges are as follows:

    a.  Chronic delinquency in timely payment of rent beginning April 2007;
    b.  Illegal appliance (clothes dryer) without consent;
    c.  Prohibited satellite dish without consent; and
    d.  Non-verifiable income from 2003-2007.

42.        The alleged behavior giving rise to each of the Charges directly result from the disabilities of Clarissa and Emily Leige.

43.      NYCHA has scheduled an administrative hearing with respect to the Charges on May 7, 2008.

44.      Upon information and belief, if, at the May 7 Hearing, NYCHA makes a prima facie case with respect to any of the Charges, absent a defense to such charges, the hearing officer will be in a position to order the eviction of the Leige family.

45.      Upon information and belief, on May 7, 2008, the scheduled date of the hearing, Ms. Leige will be in the hospital, recovering from surgery scheduled for late April, 2008.

46.      Upon information and belief, satellite dish, dryer and chronic delinquency charges were originally brought against Ms. Leige by defendant in 2003.

47.      A default judgment was entered against Ms. Leige with respect to charges similar to the Charges brought against her by defendant NYCHA.

48.      Upon information and belief, said default judgment was entered because plaintiff, due to her disabilities, was unable to attend the hearing upon which the default judgment was based and because, due to her disabilities, she was unable to manage her own affairs without assistance.

49.      Through an administrative order dated March 15, 2007 (the "March 2007 Order"), NYCHA Impartial Hearing Officer Joan Pannell vacated said default judgment against Ms. Leige and ordered NYCHA to obtain a social services evaluation of Ms. Leige.

50.      Upon information and belief, NYCHA has failed to comply with the March 2007 Order.

51.      Upon information and belief, rather than complying with the March 2007 Order, following entry of such order, NYCHA merely referred Ms. Leige to Adult Protective Services

("APS"), which is a program managed by the New York City Human Resources Administration and is charged with assisting impaired adults in need of assistance in managing their affairs.

52.        Upon information and belief, after referring Ms. Leige to APS following entry of the March 2007 Order, NYCHA took no further action to obtain a social services evaluation of Ms. Leige or to provide any other accommodation to Ms. Leige and Emily Leige.

53.        Upon information and belief, Ms. Leige completed an application for financial management assistance through APS in December, 2007. As part of the application, a physician hired by APS to evaluate Ms. Leige testified that Ms. Leige is not "capable of managing or directing the management of benefits in [her] own best interest." The application is still pending.

54.        Upon information and belief, with respect to the non-verifiable income charges, to the extent Ms. Leige has not complied with her income reporting requirements, such non-compliance is the direct result of her disabilities.

55.        Upon information and belief, Ms. Leige and her two minor children that reside with her each receive, as their sole income, supplemental security income.

56.        Upon information and belief, Miriam Saillant, the Carey Gardens Housing Assistant, is a NYCHA employee who since 2005 or earlier has intimate or near intimate knowledge and awareness of the Leige family disability history, the Charges, and the causes leading up to the Charges.

57.        Upon information and belief, Ms. Leige's family income information – in its entirety – has been reported on a regular basis to Ms. Saillant.

58.         Upon information and belief, since NYCHA referred Ms. Leige to APS, either APS and/or the Jewish Association for the Services of the Aged ("JASA"), has contacted NYCHA's office and/or Ms. Saillant.

59.         Upon information and belief, following entry of the March 2007 Order, except for the aforementioned referral, NYCHA's staff has not worked with either APS or JASA in connection with Ms. Leige.

60.         Upon information and belief, Ms. Leige's family income is sufficient to pay the rent on an ongoing basis.

61.         Upon information and belief, charges related to Ms. Leige's alleged chronic rent delinquency are directly related to, and are the result of, Ms. Leige's chronic inpatient hospital visits over the last 12 months.

62.         Upon information and belief, as of the date of the Complaint, Ms. Leige is not currently delinquent with respect to any amount due to NYCHA.

63.         Upon information and belief, due to Ms. Leige's disabilities, causing her to be unable to manage her own financial affairs, APS has a duty to manage Ms. Leige's financial affairs and as such, will approve her application for financial management.

64.         Upon information and belief, once Ms. Leige's financial management application is approved, APS will be charged with ensuring that Ms. Leige's rent is paid to NYCHA on a timely basis.

65.         Upon information and belief, once Ms. Leige's financial management application is approved, APS will be charged with ensuring that Ms. Leige fully complies with NYCHA's income reporting requirements.

66.        Upon information and belief, Ms. Leige, with the permission of NYCHA, keeps a clothes washing machine in her residence and pays a monthly fee to NYCHA on account of the washing machine.

67.        Upon information and belief, Ms. Leige keeps an electric clothes dryer in her apartment, which is vented to the outside.

68.        Upon information and belief, due to the incontinence of Ms. Leige and Emily Leige, the Leige family washes and dries several loads each day in order to accommodate the unusually large number of soiled sheets, clothes and undergarments that they go through.

69.        Upon information and belief, the unusually large number of soiled sheets, clothes and undergarments described above are the direct result of Ms. Leige and Emily Leige's disabilities.

70.        The dryer accommodates the incontinence of Ms. Leige and Emily Leige by providing them needed fresh clothing and sheets.

71.        Upon information and belief, Carey Gardens does not provide laundry services and the nearest laundromat is over seven blocks away from Carey Gardens.

72.        Upon information and belief Ms. Leige is incapable of doing laundry services herself: apart from Emily's nurse, Medicaid provides a single twelve-hour attendant to deal with the total household needs of Ms. Leige, Emily and of Zvi – Emily's 13 year old brother.

73.        Upon information and belief, if the single attendant were forced to travel hours each day to perform the Leiges' daily laundry requirements, than the attendant would not be in a position to perform her other required responsibilities.

74.          Upon information and belief, in addition, given the unusual size of its laundry requirements, forcing the Leige family to use a coin operated laundromat – which includes a profit element not present in home laundry – would be a severe economic strain on the Leige family that could easily cost several hundred dollars per month.  Simply put, the inability to wash and dry their clothes at home would be a severe hardship to the Leige family's daily routine as well as its pocketbook.

75.          Upon information and belief, Ms. Leige cannot afford to have her clothes serviced at a laundromat because supplemental security income is her family's sole source of income.

76.          Upon information and belief, the reason why supplemental security income is her family's sole source of income is because Ms. Leige and her two minor children are each disabled.

77.          Upon information and belief, since before the Charges were brought, both NYCHA and Ms. Saillant have had actual notice that the dryer is a necessity to the Leige household and is a direct result of Ms. Leige and Emily Leige's incontinence.

78.          Upon information and belief, Cablevision is the sole cable television provider to Carey Gardens.

79.          Upon information and belief, the Leige household subscribes to DirectTV and not Cablevision.

80.          Upon information and belief, the sole reason why the Leiges prefer DirectTV over Cablevision is because the former provides a channel, BabyFirstTV, which is not offered by the latter.

16

81.         Upon information and belief, BabyFirstTV, and the daily variety it offers, is an important part of Emily's daily routine -- and has in many ways, become the de facto substitute for her education.  Although designed for babies, throughout the day BabyFirstTV offers sounds, words, music and a variety of life's simplest auditory lessons, which neatly accommodate Emily's need for auditory stimulation.  The Leige family is aware of no substitute.  Indeed, upon information and belief, there are no substitute recordings available.  Even so, the variety offered by BabyFirstTV each day and throughout the day is critical to Emily's education.  For, as explained by Ms. Leige, if Emily had only one or two recordings, it would be the equivalent of trying to teach a child in school by only reading to her the same one or two books each day.

82.         Upon information and belief, since before the Charges were brought, NYCHA and Ms. Saillant have had actual notice of Emily Leige's necessity to subscribe to DirectTV.

83.         Upon information and belief, the Leige family must keep an operating satellite dish installed in order to watch programming through DirectTV.

84.         Upon information and belief, the Leige family has had installed an operating DirectTV satellite.

85.         Upon information and belief, the satellite is bolted to an east cement wall on the interior of the Leige family's balcony.

86.         Upon information and belief, the satellite has caused no damage to the exterior of the Carey Gardens building.

87.         Upon information and belief, due to the method in which it is installed, it would be physically impossible for the satellite to damage the exterior of the building.

88.         Upon information and belief, the balcony contains no open spaces below the installation point of the satellite.

89.         Upon information and belief, due to the method in which it installed, it would be physically impossible for the satellite to fall anywhere, but within the interior of the balcony rented by the Leige family.

90.         On April 15, 2008, Jonathan Koevary, Esq., on behalf of Ms. Leige, sent a letter ("Letter Demand") to NYCHA demanding, inter alia, that (i) NYCHA provide accommodations to Ms. Leige in relation to each of the Charges; and (ii) NYCHA drop the Charges.

91.         The Letter Demand outlined in detail the Leige's disabilities and rationale supporting accommodation.

92.         The Letter Demand also requested adjournment of the hearing.

93.         To date, NYCHA has not responded to the Letter Demand.

94.         Defendants' failure to accommodate plaintiff and her family places disabled tenants in danger of eviction and homelessness, with potentially catastrophic consequences for their health and well-being.


## CLAIMS FOR RELIEF

### First Claim: Failure to Accommodate Plaintiff's Disabilities

95.         Defendants' bringing of the termination of tenancy proceedings is a failure to reasonably accommodate the disabilities of plaintiff and her family with respect to the (i) rent delinquency; (ii) non-verifiable income issues; (iii) accommodation of the plaintiff's necessity to keep a dryer; and (iv) accommodation of plaintiff's necessity to subscribe to BabyFirstTV, and a

violation of plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. §

12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fair

Housing Act, as amended, 42 U.S.C. § 3601 et seq., and the Due Process Cause of the Fourteenth

Amendment of the United States Constitution.  This failure has damaged plaintiff in an amount

to be determined at trial.

### Second Claim: Failure to Implement Procedures

96.        Defendants' failure to adopt and implement adequate procedures to insure that

disabled tenants receive appropriate accommodations that would prevent future charges from

arising violates plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C.

§ 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fair

Housing Act, as amended, 42 U.S.C. § 3601 et seq., and the Due Process Cause of the Fourteenth

Amendment of the United States Constitution. This failure has damaged plaintiff in an amount to

be determined at trial.

### Third Claim: Failure to Follow Existing NYCHA Regulations and Procedures

97.        Defendants' failure to reasonably accommodate the disabilities of plaintiff and her

family with respect to the (i) rent delinquency; (ii) non-verifiable income issues; (iii)

accommodation of the plaintiff's necessity to keep a dryer; and (iv) accommodation of plaintiff's

necessity to subscribe to BabyFirstTV, was a violation of plaintiff's rights under NYCHA's own

policies and procedures.  This failure has damaged plaintiff in an amount to be determined at

trial.

19

**RELIEF REQUESTED**

WHEREFORE, plaintiff requests that this Court issue an order and judgment as follows:

(i)          Declaring that defendants' failure to reasonably accommodate plaintiff's disabilities violates:

       (a)     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and its implementing regulations;

       (b)     Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794, and its implementing regulations;

       (c)     the Fair Housing Act, as amended, 42 U.S.C.§ 3601 et seq., and its implementing regulations;

       (d)     NYCHA policy; and

       (e)     the Due Process Clause of the United States Constitution.

(ii)        Issuing a permanent injunction requiring defendants to accommodate the needs of

plaintiff and her family for financial management; a clothes dryer; and BabyFirstTV.

(iii)       Awarding plaintiff damages for the injuries and expenses incurred as a result of

the preceding violations; and,

(iv)        Granting such further and other relief as this Court deems just and proper.


Dated: Brooklyn, New York
       April 28, 2008

                            Yours truly,

                            **JOHN C. GRAY, ESQ.**
                            **BROOKLYN LEGAL SERVICES CORP. B**
                            Jonathan Koevary (JK 5730), Of Counsel
                            105 Court Street
                            Brooklyn, NY 11201
                            (718) 237-5500/5523 phone
                            (718) 855-0733 fax
                            Attorneys for Plaintiff

                            BY: _____
                                Jonathan Koevary (JK 5730)