UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CLARISSA LEIGE,

                Plaintiff,

      -against-

TINO HERNANDEZ, as Chairman of the
New York City Housing Authority,
and the NEW YORK CITY HOUSING
AUTHORITY.

                Defendants.

------------------------------------------------------x

**08 Civ. 3968 (NRB)**

**FIRST AMENDED
COMPLAINT**

## PRELIMINARY STATEMENT

1.        This First Amended Complaint amends a complaint in the above-captioned

proceeding dated April 28, 2008 [Dkt. No. 1].

2.        This is an action seeking declaratory, injunctive and monetary relief brought on

behalf of plaintiff Clarissa Leige ("Ms. Leige"), who for nearly ten years, with her two minor

children – one of whom, Emily, is severely disabled – has resided in a building managed by

defendant New York City Housing Authority ("NYCHA"). Although aware of the severity of

the disabilities of Ms. Leige and of Emily, NYCHA has improperly brought an administrative

proceeding seeking to terminate Ms. Leige's tenancy – even though each of the four charges

brought against Ms. Leige directly result from her and her daughter's disabilities. Defendants, in

bringing these charges and seeking the eviction of the Leige family, thus violated their duty to

make reasonable accommodations in their policies and procedures for disabled persons as mandated by the Americans with Disabilities, Rehabilitation, Fair Housing Amendment Acts and NYCHA's own policy, and denied plaintiff due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.  In addition, in bringing at least one of these charges, NYCHA has violated Federal Communications Commission regulations by seeking, through improper means, to evict Ms. Leige for maintaining a satellite dish in an area of her exclusive use and control by way of her leasehold interest – a satellite dish which, upon information and belief, she is entitled to maintain in accordance with Federal Communications Commission regulations and the Telecommunications Act of 1996.  Finally, Ms. Leige seeks relief under the Americans with Disabilities and Rehabilitation Acts on the grounds that Defendants have failed to grant her request to modify her bathroom facilities to accommodate the needs of her severely disabled daughter.

## JURISDICTION AND VENUE

3.        This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States; 28 U.S.C. § 1343 for actions arising under laws providing for the protection of civil rights; 28 U.S.C. § 1367 for non-federal claims so related to the action brought herein that they form part of the same case or controversy under Article III of the United States Constitution; 29 U.S.C. § 794a as an action pursuant to § 504 of the Rehabilitation Act of 1973; 42 U.S.C. § 12133 as an action pursuant to the Americans with Disabilities Act of 1990; Section 207 of the Telecommunications Act of 1996; 47 CFR 1.4000; NYCHA Policy and the Fourteenth Amendment of the United States Constitution.

2

4.        Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

5.        Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because that is the district of the Defendants' principal place of business.

## PARTIES

6.        Plaintiff CLARISSA LEIGE is a disabled tenant whose mobility is substantially impaired and who, among other things, suffers from debilitating bone cancer and severe lymphedema of the legs. Although frequently hospitalized as an inpatient, she has resided with her two minor children at 2007 Surf Avenue, Apartment 6L, Brooklyn, New York since in or about April 1999. 2007 Surf Avenue is a NYCHA public housing project also known as Carey Gardens.

7.        Defendant NEW YORK CITY HOUSING AUTHORITY is a public housing agency in the City of New York, with a principal place of business of 250 Broadway, New York, New York 10007. NYCHA is Ms. Leige's landlord.

8.        Defendant TINO HERNANDEZ is the Chairman of NYCHA. Defendant Hernandez is being sued in his official capacity.

## STATUTORY AND REGULATORY SCHEME

### The Americans with Disabilities Act

9.        Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, et seq., states that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

10.        Under the ADA, an individual with a disability is a person who has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or [is] regarded as having such an impairment." 28 C.F.R. § 35.104. See 42 U.S.C. 12102.

11.        The phrase "physical or mental impairment" means:

> (A)    Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine;
> (B)    Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 35.104.

12.        A "public entity" is defined as "any department, agency ... or other instrumentality of a State or States or local government . . . . " 42 U.S.C. § 12131(1).

13.        A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. 12131(2)].

14.        U.S. Department of Justice regulations provide that

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of

4

disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

15.         Federal regulations further provide that:

(a)    No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied benefits of the services, programs, or other activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability --

(i)     Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii)    Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii)   Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

* * * *

(vii)   Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

* * * *

(b)(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

    (i)      That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

28 C.F.R. § 35.130.

16.         In setting forth rules to be followed by public entities in providing services, ADA regulations require that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160.

17.         The Department of Justice has advised public agencies such as defendant NYCHA that they must make reasonable modifications in their policies, practices, or procedures to avoid discrimination that violates the ADA.

ADA Title II Technical Assistance Manual, United States Department of Justice.

## Section 504 of the Rehabilitation Act of 1973

18.         Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, ("Section 504") provides that:

> No otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). Section 504's definition of an "individual with a disability" is the same as the definition under the ADA.

29 U.S.C. § 705(20)(A).

19.         Federal regulations implementing Section 504 mandate that no recipient of Federal funds shall:

utilize criteria or methods of administration the purpose or effect of which would:

> (ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap ...

24 C.F.R. § 8.4(b)(4).

20.        Federally assisted programs "must afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as "non-handicapped persons." 24 C.F.R. § 8.4(b)(2).

21.        The remedies, procedures, and rights provided by the Rehabilitation Act, described <u>supra</u>, are incorporated into the ADA. 42 U.S.C. § 12133. Furthermore, Federal regulations implementing Title II of the ADA provide that standards under the ADA and its implementing regulations shall not be construed as imposing lesser standards than those applied under the Rehabilitation Act and its implementing regulations. 28 C.F.R. § 35.103(a).

### The Fair Housing Act

22.        The Fair Housing Act prohibits discrimination in the sale or rental of housing, exempting only single family dwellings and owner-occupied buildings containing less than five units. 42 U.S.C. §§ 3603, 3604.

23.        In 1988, Congress amended the Fair Housing Act to bar discrimination against people with disabilities. The amendment provides that it shall be unlawful:

> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of --
>
> > (A) that buyer or renter;
> >  . . . .
>
> (f)(2) To discriminate against any person in the terms,

7

conditions, or privileges of sale or rental of a dwelling,
or in the provision of services or facilities in connection
with such dwelling, because of a handicap of --

> (A) that person;
> . . . .

(f)(3) For purposes of this subsection, discrimination includes--
> . . . .
> (B) <u>a refusal to make reasonable accommodations</u> in rules, policies,
> practices, or services, when such accommodations may be necessary to
> afford such person equal opportunity to use and enjoy a dwelling ...

42 U.S.C. § 3604 (emphasis added).

The Fair Housing Act's definition of "handicap" mirrors the definition of an

"individual with a disability" as set forth in Section 504 of the Rehabilitation Act of 1973.

<u>Compare</u> 42 U.S.C. § 3602(h) <u>with</u> 29 U.S.C. § 705(20)(A).

**NYCHA Policy**

24.        NYCHA's own policy expressly recognizes its obligations under federal law and

"has designated a Coordinator to ensure its compliance with the ADA and Section 504."

<u>NYCHA 070/225 (7/02) (ADA/Section 504 Grievance Procedure)</u>.  In addition NYCHA has

adopted its own "internal grievance procedure for prompt and equitable resolution of complaints

alleging housing or employment discrimination against the disabled." <u>Id.</u>  By its own terms, the

"grievance procedure is not a prerequisite to the pursuit of other remedies available under the

ADA or Section 504." <u>Id.</u>

25.        In addition, NYCHA's Termination of Tenancy Procedures ("Procedures")

adopted pursuant to the consent decree in <u>Escalera v. New York City Housing Authority</u>, 67 Civ.

4307 (S.D.N.Y. 1971), state, in Paragraph 2 thereof, that prior to commencing proceedings to

terminate a tenancy, the tenant's project manager will interview the tenant in order to discuss the

problem which may lead to termination of tenancy, seek to ascertain the facts involved, and, when appropriate, seek to assist the tenant by securing outside help.

26.         Paragraph 3 of the Procedures states that "[i]f remedial action by the Manager fails, or if the Manager believes that termination of tenancy is the appropriate course of action, he shall submit [his recommendations] to the Tenancy Administrator for review . . . .

27.         Paragraph 2 of the termination procedures incorporated in the consent decree in Escalera, states that the Manager will not forward the tenant's file to the Tenancy Administrator unless "all efforts to resolve the problems have failed, and the Manager feels that termination of tenancy should be pursued."

28.         Chapter VII(II)(A) of the NYCHA's Management Manual ("Manual") states that

> among the Housing Manager's over-all responsibilities . . . is the prevention of the development of conditions which might lead to termination of tenancy. Where it appears that a tenant is not fully aware of his/her responsibilities and is thus jeopardizing his/her tenancy, the Housing Manager should acquaint the tenant with these responsibilities . . . the Housing Manager should attempt, through discussions and referrals to social agencies, to correct the conditions before they reach a stage where there is no alternative but termination proceedings.

29.         Chapter VII(IV)(C)(3)(c) of the Manual states that

> Before considering [termination proceedings] in a chronic rent delinquency case, the Project Manager must be sure that all possible action to improve the tenant's rent paying record has been taken.  For example, has a two party or vendor check been requested in the case of a chronic welfare delinquent?  If all efforts have failed, chronic rent delinquency action may be commenced ...

30.         Respondent's Management Manual states that "at the first sign of rent delinquency, the tenants should be called to the office or interviewed at their apartments ... in order to ascertain the reason for delinquency.  At the interview the importance of prompt rent

payments as well as the consequences of rent delinquency must be stressed." Manual, Chapter

V(VI)(D)(3).

## The Telecommunications Act

31.        Section 207 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110

Stat. 56 (1996) provides:

> Within 180 days after the date of enactment of this Act, the
> [Federal Communications] Commission shall, pursuant to Section 303 of the
> Communications Act, promulgate regulations to prohibit restrictions that impair a
> viewer's ability to receive video programming services through devices designed
> for over-the-air reception of television broadcast signals, multichannel multipoint
> distribution service, or direct broadcast satellite services.

32.        In response to its mandate, the Federal Communications Commission has

imposed its "Preemption of Restrictions that 'Impair' the Ability to Receive Television

Broadcast Signals, Direct Broadcast Satellite Services, or Multichannel Multipoint Distribution

Services or the Ability to Receive or Transmit Fixed Wireless Communications Signals"

(Preamble to 47 CFR 1.4000) as follows:

> (a)(1) Any restriction, including but not limited to any state or local law or
> regulation, including zoning, land-use, or building regulations, or any private
> covenant, contract provision, lease provision, homeowners' association rule or
> similar restriction, on property within the exclusive use or control of the antenna
> user where the user has a direct or indirect ownership or leasehold interest in the
> property that impairs the installation, maintenance, or use of:
>
>> (i) An antenna that is:
>>> (A) Used to receive direct broadcast satellite service, including
>>> direct-to-home satellite service, or to receive or transmit fixed
>>> wireless signals via satellite, and
>>> (B) One meter or less in diameter or is located in Alaska;
>> (ii) An antenna that is:
>>> (A) Used to receive video programming services via multipoint
>>> distribution services, including multichannel multipoint
>>> distribution services, instructional television fixed services, and

local multipoint distribution services, or to receive or transmit fixed wireless signals other than via satellite, and

(B) That is one meter or less in diameter or diagonal measurement;

(iii) An antenna that is used to receive television broadcast signals; or

(iv) A mast supporting an antenna described in paragraphs (a)(1)(i), (a)(1)(ii), or (a)(1)(iii) of this section; is prohibited to the extent it so impairs, subject to paragraph (b) of this section.

(2) For purposes of this section, "fixed wireless signals" means any commercial non-broadcast communications signals transmitted via wireless technology to and/or from a fixed customer location. Fixed wireless signals do not include, among other things, AM radio, FM radio, amateur ("HAM") radio, Citizen's Band (CB) radio, and Digital Audio Radio Service (DARS) signals.

(3) For purposes of this section, a law, regulation, or restriction impairs installation, maintenance, or use of an antenna if it:

(i) Unreasonably delays or prevents installation, maintenance, or use;

(ii) Unreasonably increases the cost of installation, maintenance, or use; or

(iii) Precludes reception or transmission of an acceptable quality signal.

(4) Any fee or cost imposed on a user by a rule, law, regulation or restriction must be reasonable in light of the cost of the equipment or services and the rule, law, regulation or restriction's treatment of comparable devices. No civil, criminal, administrative, or other legal action of any kind shall be taken to enforce any restriction or regulation prohibited by this section except pursuant to paragraph (d) or (e) of this section. In addition, except with respect to restrictions pertaining to safety and historic preservation as described in paragraph (b) of this section, if a proceeding is initiated pursuant to paragraph (d) or (e) of this section, the entity seeking to enforce the antenna restrictions in question must suspend all enforcement efforts pending completion of review. No attorney's fees shall be collected or assessed and no fine or other penalties shall accrue against an antenna user while a proceeding is pending to determine the validity of any restriction. If a ruling is issued adverse to a user, the user shall be granted at least a 21-day grace period in which to comply with the adverse ruling; and neither a fine nor a penalty may be collected from the user if the user complies with the adverse ruling during this grace period, unless the proponent of the restriction demonstrates, in the same proceeding which resulted in the adverse ruling, that the user's claim in the proceeding was frivolous.

(b) Any restriction otherwise prohibited by paragraph (a) of this section is permitted if:

(1) It is necessary to accomplish a clearly defined, legitimate safety objective that is either stated in the text, preamble, or legislative history of the restriction or

11

described as applying to that restriction in a document that is readily available to antenna users, and would be applied to the extent practicable in a non-discriminatory manner to other appurtenances, devices, or fixtures that are comparable in size and weight and pose a similar or greater safety risk as these antennas and to which local regulation would normally apply; or

(2) It is necessary to preserve a prehistoric or historic district, site, building, structure or object included in, or eligible for inclusion on, the National Register of Historic Places, as set forth in the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470, and imposes no greater restrictions on antennas covered by this rule than are imposed on the installation, maintenance, or use of other modern appurtenances, devices, or fixtures that are comparable in size, weight, and appearance to these antennas; and

(3) It is no more burdensome to affected antenna users than is necessary to achieve the objectives described in paragraphs (b)(1) or (b)(2) of this section.

(c) In the case of an antenna that is used to transmit fixed wireless signals, the provisions of this section shall apply only if a label is affixed to the antenna that:

(1) Provides adequate notice regarding potential radiofrequency safety hazards, e.g., information regarding the safe minimum separation distance required between users and transceiver antennas; and

(2) References the applicable FCC-adopted limits for radiofrequency exposure specified in § 1.1310 of this chapter.

(d) Local governments or associations may apply to the Commission for a waiver of this section under § 1.3 of this chapter. Waiver requests must comply with the procedures in paragraphs (f) and (h) of this section and will be put on public notice. The Commission may grant a waiver upon a showing by the applicant of local concerns of a highly specialized or unusual nature. No petition for waiver shall be considered unless it specifies the restriction at issue. Waivers granted in accordance with this section shall not apply to restrictions amended or enacted after the waiver is granted. Any responsive pleadings must be served on all parties and filed within 30 days after release of a public notice that such petition has been filed. Any replies must be filed within 15 days thereafter.

(e) Parties may petition the Commission for a declaratory ruling under § 1.2 of this chapter, or a court of competent jurisdiction, to determine whether a particular restriction is permissible or prohibited under this section. Petitions to the Commission must comply with the procedures in paragraphs (f) and (h) of this section and will be put on public notice. Any responsive pleadings in a Commission proceeding must be served on all parties and filed within 30 days

after release of a public notice that such petition has been filed. Any replies in a Commission proceeding must be served on all parties and filed within 15 days thereafter.

(f) Copies of petitions for declaratory rulings and waivers must be served on interested parties, including parties against whom the petitioner seeks to enforce the restriction or parties whose restrictions the petitioner seeks to prohibit. A certificate of service stating on whom the petition was served must be filed with the petition. In addition, in a Commission proceeding brought by an association or a local government, constructive notice of the proceeding must be given to members of the association or to the citizens under the local government's jurisdiction. In a court proceeding brought by an association, an association must give constructive notice of the proceeding to its members. Where constructive notice is required, the petitioner or plaintiff must file with the Commission or the court overseeing the proceeding a copy of the constructive notice with a statement explaining where the notice was placed and why such placement was reasonable.

(g) In any proceeding regarding the scope or interpretation of any provision of this section, the burden of demonstrating that a particular governmental or nongovernmental restriction complies with this section and does not impair the installation, maintenance, or use of devices used for over-the-air reception of video programming services or devices used to receive or transmit fixed wireless signals shall be on the party that seeks to impose or maintain the restriction.

(h) All allegations of fact contained in petitions and related pleadings before the Commission must be supported by affidavit of a person or persons with actual knowledge thereof. An original and two copies of all petitions and pleadings should be addressed to the Secretary, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554. Copies of the petitions and related pleadings will be available for public inspection in the Reference Information Center, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554. Copies will be available for purchase from the Commission's contract copy center, and the Commission decisions will be available on the Internet.

47 CFR 1.4000.

## STATEMENT OF FACTS

33.        Upon information and belief, defendant NYCHA is a public entity as defined by the Americans with Disabilities Act; NYCHA is a recipient of federal funds; and defendants are subject to all of the above laws.

34.        Upon information and belief, plaintiff Clarissa Leige has limited mobility and suffers from, among other things, debilitating bone cancer, incontinence and severe lymphedema of the legs and has been hospitalized for a portion of approximately each of the last 13 months.

35.        Plaintiff's daughter, Emily Leige, is 11 years old and resides with her mother.

36.        Upon information and belief, Emily Leige is severely disabled; the New York State Department of Health has found that Emily has cerebral palsy, a seizure disorder, hydrocephalus, bronchopulmonary dysphasia and sleep apnea and is non-mobile, non-verbal, legally blind, hearing impaired and developmentally delayed.

37.        Upon information and belief, Emily Leige Emily is incontinent, has not attended school since June of 2006, and functions within the profound range of mental retardation.

38.        According to the New York City Department of Education, Emily's most recent examinations "yielded functioning to be within the profound range of mental retardation." "respiratory difficulties due to her collapsed lung," and asserts that because Emily will not open her mouth for food, "she is fed through a G-Tube." As to her incontinence, the update notes:

   a. "If she is wet or soiled, she has been known to take off her clothes and 'paint' her bed area with feces."
   b. "They have tried putting her on a toilet, but she was afraid of the experience and is not being toilet trained at this time."
   c. "Emily does not make her toileting needs known in any way."
   d. "Since Emily is getting bigger in size, she requires two people to change her diaper."

14

39.       In addition, in connection with Emily's need for auditory stimulation, the update notes how "her family and support workers try hard to present her with additional stimulation in the form of various tactile and auditory toys."

40.       Ms. Leige and her daughter, Emily, are each "individuals with disabilities" within the meaning of both the ADA and Section 504 and are each "qualified individuals with disabilities" within the meaning of the ADA.

41.       Ms. Leige and her daughter, Emily, are each "handicapped" within the meaning of the Fair Housing Act.

42.       Upon information and belief, NYCHA had actual notice of Emily Leige's severe disabilities in 1999 -- at the time the Leige family initially leased its apartment in Carey Gardens.

## Administrative Proceeding Seeking Plaintiff's Eviction

43.       Upon information and belief, in September 2007 NYCHA notified plaintiff that it was reinstating an administrative proceeding originally brought against plaintiff by NYCHA in 2003. Upon information and belief, at the time of such reinstatement, NYCHA had actual notice of plaintiff's disabilities.

44.       In connection with the restated administrative proceeding, plaintiff's counsel received a list of amended charges (the "Charges") against her on or about March 18, 2008. The Charges are as follows:

     a. Chronic delinquency in timely payment of rent beginning April 2007;
     b. Illegal appliance (clothes dryer) without consent;
     c. Prohibited satellite dish without consent; and
     d. Non-verifiable income from 2003-2007.

45.        The alleged behavior giving rise to each of the Charges directly result from the disabilities of Clarissa and Emily Leige.

46.        At the time the original complaint in this federal action was filed, a hearing to be conducted by an impartial hearing officer of NYCHA with respect to the Charges was scheduled for May 7, 2008. On May 7, 2008, in light of this federal action, NYCHA adjourned the hearing without prejudice to reschedule. Upon information and belief, the administrative proceeding remains active.

47.        Upon information and belief, if, upon rescheduling of a future hearing, NYCHA makes a prima facie case with respect to any of the Charges, absent a defense to such Charges, the hearing officer will be in a position to order the eviction of the Leige family.

48.        Upon information and belief, satellite dish, dryer and chronic delinquency charges were originally brought against Ms. Leige by defendant in 2003.

49.        A default judgment was entered against Ms. Leige with respect to charges similar to the Charges brought against her by defendant NYCHA.

50.        Upon information and belief, said default judgment was entered because plaintiff, due to her disabilities, was unable to attend the hearing upon which the default judgment was based and because, due to her disabilities, she was unable to manage her own affairs without assistance.

51.        Through an administrative order dated March 15, 2007 (the "March 2007 Order"), NYCHA Impartial Hearing Officer Joan Pannell vacated said default judgment against Ms. Leige and ordered NYCHA to obtain a social services evaluation of Ms. Leige.

52.       Upon information and belief, NYCHA has failed to comply with the March 2007 Order.

53.       Upon information and belief, rather than complying with the March 2007 Order, following entry of such order, NYCHA merely referred Ms. Leige to Adult Protective Services ("APS"), which is a program managed by the New York City Human Resources Administration – often with the assistance of non-governmental agencies such as or the Jewish Association for the Services of the Aged ("JASA") – that is charged with assisting impaired adults in need of assistance in managing their affairs.

54.       Upon information and belief, after referring Ms. Leige to APS following entry of the March 2007 Order, NYCHA took no further action to obtain a social services evaluation of Ms. Leige or to provide any other accommodation to Ms. Leige and Emily Leige.

55.       Upon information and belief, Miriam Saillant, the Carey Gardens Housing Assistant, is a NYCHA employee who since 2005 or earlier has intimate or near intimate knowledge and awareness of the Leige family disability history, the Charges, and the causes leading up to the Charges.

## Income Reporting and Chronic Rent Delinquency Charges

56.       Upon information and belief, Ms. Leige's family income information – in its entirety – has been reported on a regular basis to Ms. Saillant.

57.       Upon information and belief, since NYCHA referred Ms. Leige to APS, either APS and/or the APS division of the Jewish Association for the Services of the Aged ("JASA"), has contacted NYCHA's office and/or Ms. Saillant.

17

58.        Upon information and belief, following entry of the March 2007 Order, except for the aforementioned referral, NYCHA's staff has not responded to or worked with either APS or JASA in connection with Ms. Leige.

59.        Upon information and belief, with respect to the non-verifiable income charges, to the extent Ms. Leige has not complied with her income reporting requirements, such non-compliance is the direct result of her disabilities.

60.        Upon information and belief, the APS division of JASA is responsible for addressing any alleged non-verifiable income questions with respect to Ms. Leige and is fully prepared to work with NYCHA to provide plaintiff's income verification on a prompt basis and, with respect to future income verification requirements, in the future.

61.        Upon information and belief, Ms. Leige and her two minor children that reside with her each receive, as their sole income, supplemental security income.

62.        Upon information and belief, Ms. Leige's family income is sufficient to pay the rent on an ongoing basis.

63.        Upon information and belief, charges related to Ms. Leige's alleged chronic rent delinquency are directly related to, and are the result of, Ms. Leige's chronic inpatient hospital visits over the last 13 months.

64.        Upon information and belief, as of the date of the Complaint and of the First Amended Complaint, Ms. Leige is not delinquent with respect to any rent amount due to NYCHA.

65.        Upon information and belief, in or about April 2008, the APS division of JASA

assisted Ms. Leige in arranging for the automatic debiting of her account in order to pay

NYCHA all rent due by plaintiff on a timely basis.

66.        Upon information and belief, Ms. Leige's bank account is now set up to

automatically debit rent payments in full to NYCHA on a timely basis.

67.        Upon information and belief, the automatic debiting described above sufficiently

addresses NYCHA's chronic rent delinquency related concerns on a going forward basis.

### Need for Clothes Dryer

68.        Upon information and belief, Ms. Leige, with the permission of NYCHA, keeps a

clothes washing machine in her residence and pays a monthly fee to NYCHA on account of the

washing machine.

69.        Upon information and belief, Ms. Leige keeps an electric clothes dryer in her

apartment, which is vented to the outside.

70.        Upon information and belief, due to the incontinence of Ms. Leige and Emily

Leige, the Leige family washes and dries several loads each day in order to accommodate the

unusually large number of soiled sheets, clothes and undergarments that they go through.

71.        Upon information and belief, the unusually large number of soiled sheets, clothes

and undergarments described above are the direct result of Ms. Leige and Emily Leige's

disabilities.

72.        The dryer accommodates the incontinence of Ms. Leige and Emily Leige by

providing them needed fresh clothing and sheets.

73.      Upon information and belief, Carey Gardens does not provide laundry services and the nearest laundromat is over seven blocks away from Carey Gardens.

74.      Upon information and belief Ms. Leige is incapable of doing laundry services herself: apart from Emily's nurse, Medicaid provides a single twelve-hour attendant to deal with the total household needs of Ms. Leige, Emily and of Zvi – Emily's 13 year old brother.

75.      Upon information and belief, if the single attendant were forced to travel hours each day to perform the Leiges' daily laundry requirements, than the attendant would not be in a position to perform her other required responsibilities.

76.      Upon information and belief, in addition, given the unusual size of its laundry requirements, forcing the Leige family to use a coin operated laundromat – which includes a profit element not present in home laundry – would be a severe economic strain on the Leige family that could easily cost several hundred dollars per month.  Simply put, the inability to wash and dry their clothes at home would be a severe hardship to the Leige family's daily routine as well as its pocketbook.

77.      Upon information and belief, Ms. Leige cannot afford to have her clothes serviced at a laundromat because supplemental security income is her family's sole source of income.

78.      Upon information and belief, the reason why supplemental security income is her family's sole source of income is because Ms. Leige and her two minor children are each disabled.

79.      Upon information and belief, since before the Charges were brought, both NYCHA and Ms. Saillant have had actual notice that the dryer is a necessity to the Leige household and is a direct result of Ms. Leige and Emily Leige's incontinence.

**Need for Satellite Dish; Independent Legal Right to Maintain Same;**
**NYCHA's Failure to Follow Procedure Set Forth By Regulation**

80.         Upon information and belief, Cablevision is the sole cable television provider to Carey Gardens.

81.         Upon information and belief, the Leige household subscribes to DirectTV and not Cablevision.

82.         Upon information and belief, the primary reason why the Leiges prefer DirectTV over Cablevision is because the former provides a channel, BabyFirstTV, which is not offered by the latter.

83.         Upon information and belief, BabyFirstTV, and the daily variety it offers, is an important part of Emily's daily routine – and has in many ways, become the de facto substitute for her education. Although designed for babies, throughout the day BabyFirstTV offers sounds, words, music and a variety of life's simplest auditory lessons, which neatly accommodate Emily's need for auditory stimulation. The Leige family is aware of no substitute. Indeed, upon information and belief, there are no substitute recordings available. Even so, the variety offered by BabyFirstTV each day and throughout the day is critical to Emily's education. For, as explained by Ms. Leige, if Emily had only one or two recordings, it would be the equivalent of trying to teach a child in school by only reading to her the same one or two books each day.

84.         Upon information and belief, since before the Charges were brought, NYCHA and Ms. Saillant have had actual notice of Emily Leige's necessity to subscribe to DirectTV.

85.         Upon information and belief, the Leige family must keep an operating satellite dish installed in order to watch programming through DirectTV.

86.        Upon information and belief, the Leige family has had installed an operating DirectTV satellite dish (the "Satellite Dish").

87.        The Satellite Dish is an "antenna" within the meaning of 47 CFR 1.4000 (a)(1).

88.        Upon information and belief, the Satellite Dish is bolted to an east cement wall on the interior of the Leige family's balcony (the "Leige Balcony").

89.        Upon information and belief, plaintiff's leasehold interest in her apartment of primary residence, includes the Leige Balcony in its entirety, i.e., its walls and floor.  As such, the Leige Balcony is under plaintiff's exclusive control, thus entitling Ms. Leige to the full use and enjoyment of the Leige Balcony for the duration of her leasehold interest.

90.        Upon information and belief, the Satellite Dish has caused no damage to the exterior of the Carey Gardens building.

91.        Upon information and belief, due to the method in which it is installed, it would be physically impossible for the Satellite Dish to damage the exterior of the building.

92.        Upon information and belief, the Satellite Dish hangs over nothing but the floor of the Leige Balcony.

93.        Upon information and belief, the are no spaces between the walls of the Leige Balcony and its floor.

94.        Upon information and belief, due to the method in which it installed, it would be physically impossible for the Satellite Dish to fall anywhere but within the interior of the Liege Balcony.

95.        Pursuant to Section 207 of the Telecommunications Act of 1996 and 47 CFR 1.4000, Ms. Leige is entitled to maintain the Satellite Dish as currently installed.

96.        NYCHA cannot meet its "burden of demonstrating that [its] particular [ ] restriction complies with 47 CFR 1.4000 and does not impair the installation, maintenance, or use of" the Satellite Dish.

97.        Through the Satellite Dish Charge, NYCHA impermissibly seeks to "preclude reception or transmission of an acceptable quality signal" within the meaning of 47 CFR 1.4000(a)(3)(iii).

98.        By bringing the Satellite Dish Charge, NYCHA has violated 47 CFR 1.4000(a)(4) by failing to follow the exclusive remedy seeking procedures set forth by such subsection, which, as stated above, provides, inter alia, that "[n]o civil, criminal, administrative, or other legal action of any kind shall be taken to enforce any restriction or regulation prohibited by this section except pursuant to paragraph (d) or (e) of this section."

99.        By maintaining the Satellite Dish Charge, NYCHA continues to be in violation of 47 CFR 1.4000(a)(4) by failing to follow the exclusive remedy seeking procedures set forth by such subsection.

**Letter Demand to NYCHA**

100.      On April 15, 2008, Jonathan Koevary, Esq., on behalf of Ms. Leige, sent a letter ("Letter Demand") to NYCHA demanding, inter alia, that (i) NYCHA provide accommodations to Ms. Leige in relation to each of the Charges; and (ii) NYCHA drop the Charges.

101.      The Letter Demand outlined in detail the Leige's disabilities and rationale supporting accommodation.

102.      To date, NYCHA has not responded to the Letter Demand.

23

103.        Defendants' failure to accommodate plaintiff and her family places disabled

tenants in danger of eviction and homelessness, with potentially catastrophic consequences for

their health and well-being.

### Need for Accessible Bathroom Facilities

104.        Upon information and belief, because is cannot properly restrain her or otherwise

allow for wheelchair access, Emily Leige is incapable of being safely and properly bathed in the

facilities currently installed in her residence.

105.        Upon information and belief, since 2007, plaintiff and the APS division of JASA

has made numerous requests to NYCHA to install bathroom facilities that will safely

accommodate Emily Leige's bathing needs.

106.        Upon information and belief, the installation of "roll-in" shower or a specialized

"walk-in" tub would accommodate Emily Leige's bathing needs.

107.        Upon information and belief, requests to accommodate Emily Leige's bathing

needs were either ignored or responded to by NYCHA offering to move the Leige family to a

new apartment that accommodates Emily Leige's bathing needs.

108.        Upon information and belief, NYCHA has made no offer to physically or

economically assist the Leige family with moving, packing or unpacking in connection with any

offer it may have made to assign a new residence for the Leige family.

109.        Upon information and belief, due to Ms. Leige and Emily's disabilities, the Leige

family is unable to move without significant economic and/or physical moving, packing and

unpacking assistance.

24

110.        Upon information and belief, NYCHA has made no meaningful or reasonable offer to accommodate Emily Leige's bathing needs.

## CLAIMS FOR RELIEF

### First Claim: Failure to Accommodate Plaintiff's Disabilities With Respect to the Charges

111.        Defendants' bringing of the termination of tenancy proceedings is a failure to reasonably accommodate the disabilities of plaintiff and her family with respect to the (i) rent delinquency; (ii) non-verifiable income issues; (iii) accommodation of the plaintiff's necessity to keep a dryer; and (iv) accommodation of plaintiff's necessity to subscribe to BabyFirstTV, and a violation of plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq., and the Due Process Cause of the Fourteenth Amendment of the United States Constitution.  This failure has damaged plaintiff in an amount to be determined at trial.

### Second Claim: Failure to Accommodate
### Emily's Disabilities With Respect to Her Bathing Needs

112.        Defendants' failure to accommodate Emily Leige's bathing needs in a meaningful and/or reasonable manner is a violation of plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  This failure has damaged plaintiff in an amount to be determined at trial.

### Third Claim: Failure to Implement Procedures

113.        Defendants' failure to adopt and implement adequate procedures to insure that disabled tenants receive appropriate accommodations that would prevent future charges from arising violates plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C.

§ 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fair

Housing Act, as amended, 42 U.S.C. § 3601 et seq., and the Due Process Cause of the Fourteenth

Amendment of the United States Constitution. This failure has damaged plaintiff in an amount to

be determined at trial.

**Fourth Claim: Failure to Follow Existing
NYCHA Regulations and Procedures**

114.        Defendants' failure to reasonably accommodate the disabilities of plaintiff and her

family with respect to the (i) rent delinquency; (ii) non-verifiable income issues; (iii)

accommodation of the plaintiff's necessity to keep a dryer; and (iv) accommodation of plaintiff's

necessity to subscribe to BabyFirstTV, was a violation of plaintiff's rights under NYCHA's own

policies and procedures.  This failure has damaged plaintiff in an amount to be determined at

trial.

**Fifth Claim: Failure to Follow Procedures Set Forth By the Federal
Communications Commission in Seeking to Restrict Plaintiff's Use of the Satellite Dish**

115.        Defendant's bringing and maintenance of the Satellite Dish Charge through

improper means is a violation of plaintiff's rights under the Telecommunications Act of 1996

and of 47 CFR 1.4000.  These actions have damaged plaintiff in an amount to be determined at

trial.

**RELIEF REQUESTED**

WHEREFORE, plaintiff requests that this Court issue an order and judgment as follows:

(i)        Declaring that defendants' failure to reasonably accommodate plaintiff's

disabilities violates:

      (a)     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and its implementing regulations;

      (b)     Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794, and its implementing regulations;

      (c)     the Fair Housing Act, as amended, 42 U.S.C.§ 3601 et seq., and its implementing regulations (except with respect to Emily Leige's bathing needs);

      (d) NYCHA policy (except with respect to Emily Leige's bathing needs); and

      (e) the Due Process Clause of the United States Constitution (except with respect to Emily Leige's bathing needs).

(ii)       Issuing a permanent injunction requiring defendants to accommodate the needs of plaintiff and her family for financial management and income verification assistance; a clothes dryer; BabyFirstTV; and facilities suitable for Emily Leige's bathing needs.

(iii)      Declaring that the defendants violated Section 207 of the Telecommunications Act of 1996 and 47 CFR 1.4000 by bringing and by maintaining the Satellite Dish Charge.

(iv)      Issuing a permanent injunction requiring defendants to comply with 47 CFR 1.4000, including the remedy provisions set forth therein.

(v)       Awarding plaintiff damages for the injuries and expenses incurred as a result of the preceding violations; and,

(vi)      Granting such further and other relief as this Court deems just and proper.

Dated: Brooklyn, New York
      May 14, 2008

           Yours truly,

           **JOHN C. GRAY, ESQ.**
           **BROOKLYN LEGAL SERVICES CORP. B**
           Jonathan Koevary (JK 5730), Of Counsel
           105 Court Street
           Brooklyn, NY 11201
           (718) 237-5500/5523 phone
           (718) 855-0733 fax
           Attorneys for Plaintiff

         BY:       /s/ Jonathan Koevary
                 Jonathan Koevary (JK 5730)